eFiled Date: 08/24/2020, Accepted: 08/24/2020 09:09 AM
Case 3:21-cv-00050-TJC-JBT   Document 3   Filed 01/15/21   Page 1 of 13 PageID 157

Filing # 112236382 E-Filed 08/24/2020 09:07:47 AM

IN THE CIRCUIT COURT OF THE FOURTH JUDICIAL CIRCUIT,
IN AND FOR CLAY COUNTY, FLORIDA

YHT AND ASSOCIATES, INC., as Trustee
under 20438 Homosassa Court I.V. Trust
dated January 17, 2012,

    Plaintiff,

v.

                                                                Case No.:

DEUTSCHE BANK NATIONAL TRUST COMPANY,
as Trustee, on behalf of the holders of the Residential
Accredit Loans, Inc., Mortgage Asset-Backed Pass-Through
Certificates, Series 2007-QS3,

    Defendant.
_____/

## COMPLAINT
## AND DEMAND FOR JURY TRIAL

Plaintiff, YHT AND ASSOCIATES, INC., as Trustee under 20438 Homosassa Court I.V. Trust dated January 17, 2012 ("Plaintiff"), by and through its undersigned counsel, sues Defendant, DEUTSCHE BANK NATIONAL TRUST COMPANY, as Trustee, on behalf of the holders of the Residential Accredit Loans, Inc., Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QS3 ("Defendant"), and would show:

## BACKGROUND

1. All conditions precedent to the filing of this action have been met, waived, or otherwise satisfied.

2. Venue is proper in Clay County, Florida, as the cause of action accrued here.

3. Plaintiff has owned the property located at 20348 Homosassa Court, Land O Lakes, FL 34637 ("the Property") since January 17, 2012.

1

4. On or about August 15, 2006, George Phillips ("Phillips") entered a promissory note ("the Note") and mortgage ("the Mortgage") with Mortgage Corporation of America ("MCA"), which Mortgage was recorded in the Pasco County Official Records at Book 7152, Page 1653.

5. Instead of operating merely as a lien on the Property, as required by Florida Statute § 697.01, the Mortgage also read like a contract, requiring the remittance of monetary payments, including payments of property taxes and insurance.

6. Shortly after closing on this loan, MCA sold the Note to a third-party depositor ("the Depositor"), which bundled the Note together with many other promissory notes (collectively "the Notes" or "the Loans") for the purpose of creating a trust.

7. Upon the creation of the trust, a prospectus was generated and disseminated to investors for the purpose of selling Certificates (identified as Notes of the trust), and the investors purchased said Certificates, making them Certificateholders in the trust. The Depositor then assigned the cash flows from the Loans to the Trust, which in this case was called Residential Accredit Loans, Inc., Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QS3 ("the Trust").

8. Pursuant to the terms of the prospectus, the cashflows from the Loans were used as collateral, and the Trust issued securities. The Certificateholders had no ownership interest in the Loans, but were paid monthly payments from the cash flows from the Loans as the borrowers on the Loans ("the Borrowers") made their monthly Loan payments. Significantly, the amounts received by the Certificateholders were fixed and did not in any way hinge on whether the Borrowers actually made their monthly payments.

9. Pursuant to H.R. 4557 Investment Company Act of 1940, as modified by H.R. REP 98-994, 98-293 STAT. 1689 Secondary Mortgage Market Act of the 98th Congress, the Trust did not own or hold any of the Notes or the mortgages for which the Notes acted as security ("the Mortgages"). In fact, Section 310(b)(3) 211.01 states that it was illegal for Defendant to own or hold the Notes, regardless of whether they were in default. Rather, the Trust was merely a real estate mortgage investment conduit (REMIC, for short) created by the election of IRS Tax Code 860(g) for the payment of cash flows, with the Loans used as collateral. This particular REMIC contained no assets, as it was a bankruptcy-remote, tax-exempt investment conduit trust for the purpose of moving cash flows for Pass-Through Certificates. As such, the tax liability "passed through the trust" directly to investors to avoid double taxation. Of course, Defendant knew of these restrictions, as it was a T-1 license holder, governed by the Securities and Exchange Act of 1934 and the Trust Indenture Act.

10. Upon purchasing these cash flows from the Loans, the Certificateholders relied on various representations from the underwriters, rating company, the Depositor, and the Issuing Entity, including that the Loans passed the asset requirements of section 860(a)(1) and § 1.860G-1(a) or a residual interest as defined in section 860G(a) and § 1.860G-1(c) to be of the same type and contained the same risk factors – essentially, that they were all high-quality loans ("the Warranties"). The purpose of the Warranties was to induce the Certificateholders to buy the Certificates by giving the Certificateholders peace of mind that the Borrowers were likely to make their monthly Loan payments, enabling the Certificateholders to continue collecting an available monthly cash flow from the Trustee to the Certificateholders for many years thereafter. The Certificateholders' indenture agreement with the Depositor and the Issuer entitled the

Certificateholders to the cash flows that would have been generated when the replacement of the cash flows or the replacement of the non-conforming loans took place.

11. Deutsche Bank National Trust Company ("Deutsche") never owned or held the Notes, either as Trustee or in its individual/corporate capacity. As Trustee, it owed fiduciary duties to the Certificateholders. The first duty was the obligation to review each loan and verify that it qualified for inclusion in the Trust. The second was to ensure the original lender purchased back the Notes that did not live up to the Warranties – the sole remedy available to Certificateholders.

12. Deutsche's most important duty to the Certificateholders, as stated in Trustee's duties 15 U.S.C. §77000 - Duties and responsibility subsection 15 U.S.C. §77ppp Prohibition of impairment of holder's right to payment, is the Trustee must pay cash flows to the Certificateholders. Notably, this duty is not contingent upon any other condition.

13. Notwithstanding the Warranties, the Loans were not high-quality loans. In fact, so many of the Borrowers stopped making their monthly payments that the Certificateholders were no longer collecting the cash flows they expected to receive when they bought the Certificates, and the Trustee was not fixing the problem by remitting the difference. As a result, the Certificateholders wanted to exercise their sole remedy by returning the Certificates to the Depositor and having their purchase price returned – essentially, a refund.

14. By 2009, however, the Depositor was no longer in business. As Trustee of the Trust, Deutsche was still responsible for collecting cash flows on behalf of the Certificateholders. Yet it was failing to do so. The Borrowers, for example, stopped making payments under the Note in 2009 – one of many Borrowers who did so. That resulted in a conveyance of title to Plaintiff, which has owned the Property since that time.

15. With Plaintiff as the new owner of the Property and Phillips not making mortgage payments, a lawsuit was filed against both Plaintiff and the Borrowers, Pasco County Case No. 19-CA-2891 ("the Lawsuit"), with Defendant named as the plaintiff. The genesis of the Lawsuit was Defendant's attempt to foreclose the Mortgage and divest Plaintiff of ownership of the Property.

16. For several reasons, Defendant's filing of the Lawsuit and its prosecution thereof was fraudulent, illegal, and perjurious, rendering the entire proceeding, and any rulings emanating from it, void.

17. First, Defendant was neither the owner nor the holder of the Note by operation of law. In fact, it was illegal for Defendant to own or hold the Notes. Defendant knew this, yet it intentionally represented otherwise in the Lawsuit, under oath, in a fraudulent, illegal, and perjurious attempt to foreclose the Mortgage and steal the Property from Plaintiff, violating § 517.301 of the Florida Securities Fraudulent Acts Statute.

18. Second, the Lawsuit was brought in the name of the Certificateholders, which were identified in the style of the Lawsuit as the party prosecuting the case ("as Trustee, on behalf of the holders of Residential Accredit Loans, Inc., Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QS3"). However, the Certificateholders, did not authorize the Lawsuit, benefit from it, or even know it had been filed. Defendant knew the Certificateholders had no knowledge of the Lawsuit, yet it purported to prosecute it anyway – in their name, and under oath, no less – in a fraudulent and perjurious attempt to foreclose the Mortgage and steal the Property from Plaintiff. Defendant undertook these actions in its capacity as a Securities Administrator, thereby violating § 517.301 of the Florida Securities Fraudulent Acts Statute.

19. Third, Defendant was purporting to prosecute the Lawsuit in its capacity as Trustee, yet it was illegal for it to act as Trustee, as its trust license had been revoked. Quite simply, it was illegal for Deutsche to conduct trust business. Defendant knew this, yet it continued falsely representing to the Court that it was prosecuting the Lawsuit as Trustee of the Trust.

20. Despite the foregoing, the Servicers, including but not limited to PHH Mortgage Corporation ("PHH"), purporting to act as Defendant's servicer and agent with authority to bind Defendant – caused the Lawsuit to be prosecuted in Defendant's name and represented, under oath, that Defendant was the owner and holder of the Note. As Defendant is not the principal of the Trust, however, there could be no "agents" or "attorneys-in-fact," as stated in Fla. Stat. § 709.2201.

21. To support its position in the Lawsuit, various servicers ("the Servicers") took a series of actions that can only be described as fraudulent, void, perjurious, and illegal. (At any one time, only one servicer was assigned to the Loan. However, the servicer changed several times during the duration of the Lawsuit, and each of them contributed to the frauds and illegalities described herein. As such, the Servicers may sometimes be identified in the singular, *i.e.* "the Servicer" and sometimes the plural, *i.e.* "the Servicers").

22. First, the Servicers knew the Lawsuit was not being prosecuted for the benefit of the Certificateholders, as the Certificateholders did not consent to the Lawsuit, know it had been filed, or stand to benefit upon a successful outcome. Nonetheless, the Servicers intentionally represented otherwise, even going so far as to make the Trust the plaintiff in the Lawsuit, to conceal that the Servicers were the parties who stood to benefit from the Lawsuit and to fraudulently shift adverse tax consequences in the event of a foreclosure from themselves to the Certificateholders.

23. Second, the Servicers knew that Defendant was not the owner or holder of the Note by operation of law. Nonetheless, the Servicers repeatedly represented otherwise in the Lawsuit,

6

under oath, in a fraudulent and perjurious attempt to foreclose the Mortgage and steal the Property from Plaintiff.

24. Third, the Servicer caused to be recorded in the Official Records of Pasco County, Florida at Book 8630, Page 516, an Assignment of Mortgage ("the Assignment"), which purported to assign the Mortgage from Mortgage Electronic Registration Systems, Inc. ("MERS"), as Nominee for MCA, to Defendant.

25. In truth, MERS had no ability to convey the Assignment, either as Nominee for ABC or otherwise. After all, the Trust was created in 2007 by the sale of the cash flows from the Loans, so by the time of the Assignment, AHM had no interest in the Mortgage, as it had already been sold to the Depositor. The Servicer nonetheless recorded the Assignment on behalf of Defendant, in violation of Fla. § 817.535(2)(a) and constituted a criminal infraction – a felony under Florida law, and used the Assignment in the Lawsuit as a basis to foreclose in Defendant's name.

26. Fourth, the Servicer relied on a chain of endorsements on the Note, including one by SunTrust Mortgage, Inc., purportedly as attorney in fact for MCA, to itself ("the Endorsement"), and a second from SunTrust Mortgage, Inc. to Defendant, and used those endorsements as a basis to claim standing in the Lawsuit. The Endorsement, however, was not put onto the Note in the ordinary course of business, but was a pure fraud. After all, MCA ceased to exist as of the time of the Endorsement, and SunTrust Mortgage, Inc. was certainly not its attorney in fact or authorized to execute the Endorsement in this capacity. As a result, all subsequent endorsements were anomalous and of no force and effect, leaving the payee of the Note as MCA. Yet Defendant fraudulently represented otherwise in an attempt to foreclose and steal Plaintiff's property.

27. Fifth, the Servicers repeatedly represented, in the Lawsuit, that Defendant had been damaged as a result of the Borrowers' non-payment of the installment payments due under the Note. These representations were knowingly false, fraudulent, and perjurious at all times relevant. After all, the Servicers knew they were responsible for paying fixed, monthly payments to the Certificateholders, *i.e.* the cash flows, regardless of whether the Borrowers paid the payments due under the Note. The Servicers did, in fact, make these payments to the Certificateholders, and those payments "passed through" Deutsche given its role as Trustee under the Trust. Suffice it to say Servicer's repeated representations in the Lawsuit that Defendant was not damaged as a result of Plaintiffs' alleged failure to pay were a false, fraudulent, and perjurious effort to foreclose in Defendant's name where no basis to do so existed.

28. Sixth, the Servicer filed in the Lawsuit a Limited Power of Attorney from Deutsche ("LPOA"), representing that the LPOA gave it the power to act on its behalf and prosecute the Lawsuit as an agent of the Trust. These representations, however, were entirely fraudulent – and known to be so by all involved. In truth, the LPOA gave the Servicer no powers at all, as it did not authorize the Servicer to take any actions that it was not already authorized to take under the terms of separate, written agreements identified therein. In addition, the LPOA expressly prevented the Servicer from filing any action in the name of Deutsche, a restriction which it expressly violated by prosecuting the Lawsuit. Moreover, the Servicer was never a T-1 license holder, so Deutsche could not delegate its authority to act as trustee to it (any more than an attorney can delegate another to practice law with his/her law license).

29. Seventh, the Servicers fraudulently misrepresented to their attorneys that they were the agent of Defendant and authorized to act on its behalf, intending to induce and actually inducing the attorneys to act as counsel of record for Defendant in the Lawsuit. In the process, the

Servicers represented that the facts asserted in the Lawsuit, *e.g.* that Defendant was the holder of the Note and was damaged by the Borrowers' non-payment, were true – knowing they were not. This put the attorneys in the position of either not knowing that the Servicers were using them to facilitate perjurious, fraudulent, and illegal acts (and facilitating that misconduct) or knowing the Servicers were doing so and actively participating in that fraud scheme. Either way, the attorneys facilitated perjury at the behest of the Servicers, and the Servicers' use of these attorneys to commit these illegal, fraudulent and perjurious acts has placed the attorneys in an irreconcilable conflict, forcing them to choose between the Servicers, *i.e.* the entities that were paying their bills, and Defendant, the entity for which they were counsel of record in the Lawsuit.

30. At all times relevant, Deutsche knew that the actions of the Servicers in the Lawsuit were fraudulent, illegal, contemptuous, and perjurious. Nonetheless, Deutsche has intentionally engaged in a years-long pattern of facilitating and ratifying the fraudulent and illegal acts of servicers like PHH on the one hand (including those described herein) while attempting to feign ignorance of their misconduct on the other so as to avoid liability.

31. For instance, in its capacity as Trustee, Deutsche has executed many limited powers of attorney. Its purpose in doing so was to create the appearance of an agency relationship even if one did not actually exist, enabling servicers like PHH to go to court and create the impression they were an agent of PHH and authorized to prosecute a foreclosure in PHH's name and otherwise act on its behalf even if actual authority were lacking.

32. At the same time, though, Deutsche knew that servicers like PHH were using Deutsche's name to perpetuate fraudulent, illegal, perjurious, and contemptuous acts. If this misconduct ever came to light, Deutsche wanted to have plausible deniability, *i.e.* a way of saying "that servicer wasn't our agent." That is why: (i) Deutsche insisted that all limited powers of

9

attorney include language clarifying that they were not conveying any powers other than those already conveyed in separate agreements – meaning the LPOAs, despite conveying the impression of an agency relationship, conveyed no power at all; (ii) Deutsche insisted that the servicers indemnify it for all actions taken on its behalf; and (iii) when high-ranking officers within Deutsche, *e.g.* Ronaldo Reyes, were confronted with the illegal acts described herein, they disclaimed knowledge of the servicers' misconduct in any particular case, acknowledged that the servicers were not actually the agent of Deutsche, and conceded that Deutsche never owned or held any promissory notes.

33. Given repeated opportunities to disavow the fraudulent, perjurious, contemptuous, and illegal misconduct of servicers like PHH – perpetuated in the name of Deutsche, as Trustee – Ronaldo Reyes and Thomas Patrick, within the course and scope of their employment with Deutsche, did nothing. Worse yet, they not only ratified the misconduct, they continued conspiring with the servicers to conceal it from Plaintiff, the Certificateholders, and the public at large.

34. Despite its feigned ignorance, Deutsche knew full well what was happening. In fact, even after the details of the misconduct was addressed with Reyes, Patrick, and other, high-ranking officers of Deutsche in detail, Deutsche failed to take remedial measures, continued to look the other way, and did nothing to stop the servicers and their lawyers from prosecuting foreclosures in its name. In fact, Deutsche continues to execute LPOAs for these Servicers, knowing the Servicers were using them to engage in the fraudulent and illegal misconduct described herein.

35. Further proof that Deutsche's "ignorance" of the Servicers' illegality was feigned, and that Deutsche knew full well what the Servicers were doing, is seen in the indemnification agreements between it and the Servicers. After all, when an indemnification agreement exists

between a principal and an agent, the principal is typically the one who agrees to indemnify the agent for any actions taken in the scope of the agency relationship. Here, conversely, Deutsche, *i.e.* the principal, wanted Servicers like PHH, *i.e.* the agent, to indemnify Deutsche for all actions the servicers took in their name. The obvious reason for such an unusual indemnification is that Deutsche knew that servicers like PHH were using its name to engage in acts that were fraudulent, illegal, contemptuous, and perjurious, and Deutsche wanted someone else to pay in the event the fraud scheme ever came to light.

36. Deutsche's motive for participating in the foregoing was clear – money. After all, if the Servicers did not pay the monthly cash flows due to the Certificateholders, then the Certificateholders would have looked to Deutsche for those payments. Facilitating and encouraging the foregoing misconduct hence enabled Deutsche to avoid significant payments out of its own pocket.

## COUNT ONE

37. This is an action arising under the Civil Remedies for Criminal Practices Act, Fla. Stat. § 772.101, *et. seq.*, for damages in excess of $30,000, exclusive of interest, attorney's fees, and costs.

38. Plaintiff realleges and incorporates by reference paragraphs 1-36 above.

39. Defendant's misconduct, as set forth herein, constitutes violations of Fla. Stats. §§ 817.535 and 772.013(1)-(4). To wit, through a pattern of criminal activity, the collection of an unlawful debt, and by endeavoring to commit and conspiring with the Servicers to commit the foregoing acts, Defendant acquired and maintained an interest in the Property.

40. As a result of these violations, Plaintiff has been damaged. These damages include, but are not limited to, the value of the Property, lost rents on the Property during the time Plaintiff

was dispossessed, interest on that money, and the attorney's fees and costs incurred defending the Lawsuit.

41. Under the terms of Fla. Stat. § 772.014, Plaintiff is entitled to triple damages.

WHEREFORE Plaintiff demands judgment in its favor and against Defendant for damages, general and special, costs, interest, attorney's fees, and such other and further relief that this Court deems proper. Plaintiff further demands trial by jury.

### COUNT TWO

42. This is an action for damages in excess of $30,000, exclusive of interest, attorney's fees, and costs.

43. Plaintiff realleges and incorporates by reference paragraphs 1-36 above.

44. Through a series of fraudulent misrepresentations, as set forth above, Defendant slandered Plaintiff's title to the Property, then divested (or purported to divest) Plaintiff of ownership.

45. As a result of Defendant's actions, Plaintiff has been damaged. Those damages include, but are not limited to, the value of the Property, interest on that money, lost rents for the duration of time that Plaintiff has been dispossessed, and attorney's fees and costs arising from having to defend the Lawsuit.

WHEREFORE Plaintiff demands judgment against Defendant for damages, general and special, interest, attorney's fees, and costs. Plaintiff further demands a trial by jury and such other and further relief that this Court deems proper.

This 21st day of August, 2020.

        Respectfully submitted,

        */s/ Lee Segal, Esquire*
        Lee Segal, Esquire (FBN 37837)
        **Segal & Schuh Law Group, P.L.**
        18167 U.S. Highway 19 North, Suite 100
        Clearwater, Florida 33764
        Tel: (727) 824-5775 Fax: (877) 636-7408
        lee@Segalschuh.com (Attorney)
        marie@segalschuh.com (Florida Registered Paralegal)